## HELMS *v.* THE STATE.

1. Where in the course of a trial a party desires to impeach a witness by stenographic notes taken on a former trial, which notes are in an adjoining county, it is not an abuse of discretion to refuse to suspend the case until the next day to allow an effort to be made to procure the absent notes; and especially is this so where the court allows the movant to introduce witnesses who deliver testimony in accord with the alleged absent memoranda.

2. Relevant evidence dependent for its admissibility upon preliminary proof, which has been allowed without requiring such preliminary proof, should be considered by the jury; and an instruction which in effect withdraws such evidence from the jury is erroneous.

3. Where on the trial of a criminal case the accused sought to impeach a witness for the State by proof of a contradictory statement, and the State replied with proof denying that the witness made the statement, and the judge, in charging as to how witnesses may be impeached, read Penal Code (1910), § 1052, upon the subject, there being no evidence of the good character of any of the witnesses, the last clause of that section, to the effect that a witness, when impeached, may be sustained by proof of general good character, was inapplicable and improperly given in charge; but under the facts of the case, this was a harmless error.

4. Where the court instructs the jury as to the different methods of impeaching a witness and the effect of a successful impeachment, and a party desires an elaboration of the law of impeachment or a concrete application of it, he should make a pertinent and timely written request.

5. It is erroneous to charge Penal Code (1910), § 1011, that "the existence of a fact testified to by one positive witness is rather to be believed than that such fact did not exist because many witnesses who had the same opportunity of observation swear that they did not see or know

of its having transpired," without an instruction, in connection there-
with, touching the credibility of witnesses.

6. The evidence did not authorize an instruction on the law of voluntary
manslaughter. The criticism that the evidence did not authorize cer-
tain charges is not well founded.

SEPTEMBER 22, 1911.

Indictment for murder. Before Judge J. B. Park. Jasper
superior court. May 24, 1911.

*A. S. Thurman,* for plaintiff in error. *T. S. Felder, attorney-
general,* and *J. E. Pottle, solicitor-general,* contra.

EVANS, P. J. Lloyd Helms was convicted of the murder of
Joe Greer, alias Good Greer, and recommended to the mercy of
the court. The State submitted evidence tending to show that
Laura Greer, the sister of the deceased, lived in a state of con-
cubinage with the defendant. Between seven and eight o'clock at
night the defendant came to the house where Laura Greer lived;
she was sick and attended by a small girl, named Lidell Sanders.
He demanded, with an oath, that the door be opened, and Laura
told Lidell to open the door. The defendant came in the house
with his shoes under his arm, and with a knife, and asked if his
supper was ready. Upon Laura's giving him an affirmative answer,
he said he was going to the spring to get some water and was
going to kill her upon his return. As soon as he left the house
Laura ran to her mother's, about a mile or a mile and a half dis-
tant. When she reached her mother's house she cried out for
some one to open the door. Her brother, the deceased, replied,
"The door is open; come on in the house. Nobody ain't going to
bother you." The mother of Laura asked her if the defendant
was pursuing her, and she said yes, that he was going to kill her.
When the defendant arrived at the house of the mother of the de-
ceased, he said "he had to have a nigger out of there." The mother
replied, "There is no need of you carrying on this way; you better
go home," and the defendant said, "If she don't come out I will kill
her." The deceased started out of the house, when his mother told
him not to go. The deceased replied that he was going out to show
the road to the defendant. Neither the mother nor daughter saw
the deceased approach the defendant nor did they see any blow. The
deceased was stabbed with a knife. The mother of the deceased
called him, and the defendant, who had run off a short distance,
replied, "God damn him, he won't answer you any more, for I

have killed him." The homicide occurred in a road about ten steps from the door of the house. A few hours afterwards a razor, identified as belonging to the deceased, was picked up at the place where the body of the deceased was found.

1. The case had been tried on a former occasion, and was stenographically reported. The stenographer's notes, which had not been transcribed, were at his home in an adjoining county. When two of the witnesses for the State had testified, counsel for the defendant moved to suspend the trial of the case until he could send to the home of the stenographer for his notes, to be used for the purpose of impeachment. The court refused to suspend the trial, and the defendant introduced witnesses who testified that the two witnesses for the State had testified differently on the former trial. The court is not bound to suspend the trial of a cause to enable the defendant to procure additional evidence. *Zipperer* v. *Mayor and Aldermen of Savannah,* 128 *Ga.* 135 (57 S. E. 311). The defendant knew that the case had been tried on a former occasion; and if he desired the stenographic report of the case, proper diligence would have demanded that he procure it before the trial.

2. It appeared in evidence that shortly before the homicide the deceased had threatened to kill the defendant, but this threat was not communicated to the defendant prior to the homicide. The court charged the jury that any threat made by the deceased against the defendant should not be considered by the jury unless they believed that the deceased attacked the defendant, or did some overt act showing an intention to carry the threat into execution. Among other criticisms on this charge, it is contended that inasmuch as the defendant in his statement declared that the deceased attacked him and that he inflicted the mortal blow in defense of this attack, and as the evidence of the State was somewhat equivocal as to the motive of the deceased in leaving the house and as to his conduct just before he was stricken, the charge withdrew from the jury any consideration of the uncommunicated threat in determining whether the deceased was actually attacking the defendant when he received his mortal wound. It is a rule of law, that, as a preliminary to the admissibility of an uncommunicated threat by the deceased against the defendant, it must be shown that the deceased was the assailant in the fatal rencounter, or did some overt act showing an intention to carry that threat into execution, and

that this preliminary foundation must be made by proof, the defendant's statement being insufficient of itself to supply the foundation. *Rouse* v. *State*, 135 *Ga*. 227 (69 S. E. 180); *Pride* v. *State*, 133 *Ga*. 439 (66 S. E. 259). It would have been sufficient ground for the rejection of evidence of the decedent's uncommunicated threat that the proper foundation had not been laid; yet, where the evidence has been received, the defendant is entitled to have it considered by the jury in all its aspects. Evidence which has no probative value—like hearsay evidence—may be disregarded by the court in his charge; but relevant evidence, the admissibility of which is dependent upon a preliminary showing, is not to be withdrawn from the jury by the court in its charge simply because the proper foundation may not have been laid. *Goodwyn* v. *Goodwyn*, 20 *Ga*. 563; *Patton* v. *Bank of LaFayette*, 124 *Ga*. 974 (53 S. E. 664, 5 L. R. A. (N. S.) 592). The charge was harmful to the defendant, because of the uncertainty of the decedent's intent and purpose in leaving the house to meet the defendant, as disclosed by the evidence. His mother testified that after Laura Greer had reached her house, and the defendant came up, announcing his purpose "that he come to kill or get killed or have his negro out of there," she advised the decedent, as he started out of the door, to remain in the house. To this admonition the decedent replied that he was going out to show the road to the defendant. No one observed what actually transpired in the road after the decedent left the house. The evidence makes it apparent that the defendant was familiar with the road; that the house sat within a few feet of the road, with no enclosure. The prior threat of the decedent under these circumstances tended to illustrate the state of mind of the deceased, and whether his declaration that he intended to show the defendant the road meant something other than an expression of an intended friendly courtesy. *Vaughn* v. *State*, 88 *Ga*. 731 (16 S. E. 64).

3. The accused offered evidence tending to show that two of the State's witnesses had testified differently on a former trial. The State offered evidence tending to show that their testimony on the present trial was in harmony with that delivered by them on the former trial. In his charge the court read Penal Code (1910), § 1052, which provides how a witness may be impeached by contradictory statements previously made, where the proper

foundation has been laid. He read the entire section of the code, the last sentence of which is as follows: "When thus impeached he may be sustained by proof of general good character, the effect of the evidence to be determined by the jury." Error is assigned upon the reading of this code section in its entirety, because there was no attempt to sustain the witness by proof of general good character. We do not think this is sufficient ground for new trial. The State did not attempt to establish the credibility of the witnesses by proof of good character, and the reading of the entire code section under the facts of this case is not reversible error. *Kelly* v. *State*, 118 *Ga.* 329 (45 S. E. 413).

· 4. The court charged the jury concerning the different methods of impeaching a witness and the effect of a successful impeachment. Complaint is made that the court failed to further elaborate the law of impeachment and apply its principles in the concrete to the case. The court's failure in this respect, in the absence of a pertinent and timely written request, is not ground for a new trial. *Perdue* v. *State,* 135 *Ga.* 277 (69 S. E. 184).

5. The court read several sections of the Penal Code, respecting the character and degree of strength of the evidence required for a conviction in criminal cases. He also read section 1011 (quoted in the fifth headnote). Error is assigned upon the reading of this section without further stating, in connection therewith, that the rule applies only where the witnesses are of equal credibility. Whenever the judge deems it proper to give this section of the code in charge, he should accompany it by an additional charge touching the credibility of witnesses. · *Warrick* v. *State,* 125 *Ga.* 133 (53 S. E. 1027). And where he fails so to do, a new trial will ordinarily be granted, unless it appears that the failure in this respect was not calculated to harm the complaining party. While, under the facts of this case, the error may not have been so harmful to the defendant as to require a new trial, yet attention is called to it that it may be avoided on the next trial.

6. There is nothing in the evidence authorizing a charge on the law of voluntary manslaughter. If that grade of homicide was involved, it was founded solely on the statement of the accused; and there being no timely written request to charge upon the subject of manslaughter, there was no error in the failure so to do. *Cook* v. *State.* 134 *Ga.* 348 (67 S. E. 812). The criticism

that the evidence did not authorize an instruction upon certain propositions is not well founded.

*Judgment reversed. Beck, J., absent. The other Justices concur.*